1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DEAN BEAVER, et al.,

Plaintiffs,

vs.

TARSADIA HOTELS, et als.,

Defendants.

CASE NO. 11cv1842 GPC(KSC)

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART TARSADIA DEFENDANTS AND DEFENDANT PLAYGROUND DESTINATION'S MOTIONS FOR SUMMARY JUDGMENT**

[Dkt. Nos. 81, 94, 98.]

Plaintiffs Dean Beaver, Laurie Beaver, Steven Adelman, Abram Aghachi, Dinesh Gauba, Kevin Kenna and Veronica Kenna (collectively "Plaintiffs") brought a class action on behalf of themselves and all others similarly situated against developers and agents of the Hard Rock Hotel & Condominium Project ("Hard Rock"). (Dkt. No. 69, TAC.)  Plaintiffs commenced this action on behalf of persons who purchased units at the Hard Rock between May 2006 and December 2007 for Defendants' failure to disclose and intentionally concealing Plaintiffs' right to rescind their purchase contracts within two years of the date of signing the contracts.

On May 3, 2013, Plaintiffs filed a motion for summary judgment. (Dkt. No. 81.) Defendants filed oppositions and Plaintiffs replied. (Dkt. Nos. 104, 111.) On May 22, 2013, Defendants 5th Rock, Gregory Casserly, Gaslamp Holdings, LLC, MKP One,

LLC, B.U. Patel, Tushar Patel, and Tarsadia Hotels (collectively "Developer Defendants" or "Tarsadia Defendants") filed a motion for summary judgment. (Dkt. No. 94.) Plaintiffs filed an opposition and Defendants replied. (Dkt. Nos. 103, 112.) On May 31, 2013, Defendant Playground Destination Properties, Inc. ("Playground") filed a motion for summary judgment. (Dkt. No. 98.) Plaintiffs filed an opposition and Defendants replied. (Dkt. Nos. 107, 115.) On August 28, 2013, the Court held a hearing. (Dkt. No. 120.) Tyler Meade, Esq., Michael Shrag, Esq., Michael Reiser, Esq, and Donald Chomiak, Esq. appeared on behalf of Plaintiffs. Alicia Vaz, Esq., Frederick Kranz, Esq. appeared on behalf of Tarsadia Defendants, and Daniel Benjamin, Esq., and Thomas McNamara, Esq. appeared on behalf of Defendant Playground.

Based on the parties' briefs, supporting documentation, applicable law, and hearing oral argument, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS in part and DENIES in part all Defendants' motions for summary judgment.

## Procedural Background

On August 17, 2011, the proposed class action was removed from state court to this Court. (Dkt. No. 1.) On August 24, 2011, Defendants filed motions to dismiss the First Amended Complaint. (Dkt. Nos. 6, 11, 12.) On December 6, 2011, District Judge Dana Sabraw granted in part and denied in part Defendants' motion to dismiss and granted Plaintiffs leave to amend. (Dkt. No. 20.) On December 22, 2011, Plaintiffs filed a Second Amended Complaint ("SAC") alleging violations of the Interstate Land Sales Full Disclosure Act ("ILSA"), violation of California's Subdivided Lands Act, ("SLA"), fraud, negligence and violation of California Business and Professions Code sections 17200 *et seq*. (Dkt. No. 21.) Defendants again moved to dismiss the SAC on January 5, 2012. (Dkt. Nos. 22, 23.) On May 2, 2012, District Judge Dana Sabraw granted in part and denied in part Defendants' motions to dismiss the SAC. (Dkt. No. 34.) In that order, the Court dismissed the second cause of action for violation of

California's Subdivided Lands Act with prejudice. (Id.) The first and third causes of action for violation of ILSA and common law fraud were dismissed with prejudice solely as to Defendant Playground. (Id. at 18.)

On August 8, 2012, Defendant Playground filed a motion for judgment on the pleadings as to Plaintiffs' section 17200 claim. (Dkt. No. 40.) On September 27, 2012, Plaintiffs filed a motion for leave to amend to file a Third Amended Complaint ("TAC"). (Dkt. No. 43.) On October 12, 2012, the case was transferred to the undersigned judge. (Dkt. No. 52.) On April 17, 2013, the Court granted Plaintiffs' motion for leave to file a Third Amended Complaint and denied as moot Defendant Playground Destination's motion for judgment on the pleadings. (Dkt. No. 68.) On April 18, 2013, Plaintiffs filed a Third Amended Complaint ("TAC"). (Dkt. No. 69.)

On March 1, 2013, Plaintiffs filed a motion to certify class and motion for appointment of co-lead class counsel. (Dkt. Nos. 62, 63.) On June 24, 2013, the Court denied Plaintiffs' motion for class certification as premature as the legal issue of whether the Hard Rock Project was subject to ILSA needed to be addressed first. (Dkt. No. 108.)

In the TAC, Plaintiffs allege the same five causes of action as the second amended complaint but adds additional factual allegations. The five causes of action are: 1) violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* ("ILSA"); 2) California's Subdivided Lands Act, California Business and Professions Code sections 11000 *et seq.* ("SLA"); 3) fraud; 4) negligence; and 5) violation of California Business and Professions Code sections 17200 *et seq.* It should be noted that in the Court's order granting in part and denying in part Defendants' motion to dismiss the Second Amended Complaint, the Court dismissed the second cause of action for violation of the Subdivided Lands Act with prejudice. Moreover, Defendant Playground was dismissed with prejudice from the first and third causes of action for violation of ILSA and common law fraud. (Dkt. No. 34.)

**Background**

Plaintiffs allege that because Defendants failed to comply with ILSA, they violated ILSA by failing to disclose and intentionally concealed that buyers had an absolute right to rescind their purchase contracts within two years of the date of signing and making affirmative misrepresentations regarding the right to rescind to prevent Plaintiffs from exercising it.  Defendants are 5th Rock, LLC ("Seller"), the seller and developer of the Hard Rock; MKP One, LLC ("MKP"), the managing member of 5th Rock and the party that signed these contracts on behalf of 5th Rock; Tarsadia Hotels ("Tarsadia"), an entity 5th Rock retained to assist in the development, and subsequently the operation, and management of the Hotel after opening; Gregory Casserly, the President and member of the Board of Directors of Tarsadia; Tushar Patel, and B.U. Patel,  shareholders and members of the Board of Directors of Tarsadia; and Gaslamp Holdings, LLC ("Gaslamp"), an affiliate of 5th Rock that owned the land underlying the Hard Rock.  Playground was the real estate broker for the Hard Rock.

Around 2005, Defendants, through 5th Rock, began to develop a mixed-use development to include 420 guestroom commercial condominium units ("Units") called the "Hard Rock Hotel & Condominium" located at 205 Fifth Avenue in San Diego, California. Starting around May 18, 2006, Plaintiffs and 5th Rock executed a pre-printed, standardized Purchase Contract and Escrow Instructions ("Purchase Contract") prepared by Defendants for the purchase of one or more Units at the Hard Rock Project.  Most closed escrow on their Units in 2007.

Plaintiffs assert that Defendants violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSA") by failing to disclose and intentionally concealing Plaintiffs' right to rescind their purchase contracts within two years of the date of signing the Contracts. Under 15 U.S.C. § 1703(d)(2) of the ILSA, a developer is required to include in the buyer default provision of the purchase contract written notice of a 20-day opportunity for the buyer to remedy default or breach of contract. 15 U.S.C. § 1703(d)(2).  If a developer does not include the default remedy provision in the contracts, buyers then have an absolute two-year right to

1  rescind.  15 U.S.C. § 1703(d).

2  Furthermore, ILSA requires a developer to register a project with the U.S.

3  Department of Housing and Urban Development ("HUD") and to provide buyers with

4  an ILSA property report that discloses facts regarding the sales transaction.  15 U.S.C.

5  § 1703(a)(1)(B).   If a developer does not obtain an ILSA property report to be

6  distributed to buyers before they sign the purchase contract (or in the alternative, in

7  California, where a developer fails to provide buyers with an ILSA compliant public

8  report issued by the Department of Real Estate), ILSA imposes a two-year right to

9  rescind from the date of contract for the benefit of the buyers where the right to rescind

10 must be disclosed in the purchase contract.  15 U.S.C. §1703(c).

11 Plaintiffs argue that Defendants violated the ILSA by intentionally omitting the

12 statutory notice of right of rescission from the sale documents and making affirmative

13 misrepresentations regarding the right to rescind to prevent Plaintiffs from exercising

14 it.   As a result, Plaintiffs were denied their legal right to rescind as the real estate

15 market deteriorated and the economy fell into recession.

16 Defendants do not dispute that they did not provide an ILSA required property

17 report at the time of the Purchase Contract, did not provide a ILSA compliant public

18 report issued by the DRE, did not include the 20 day opportunity for the buyer to

19 remedy default or breach, and did not include a two year right to rescind in the

20 Purchase Contract.  They contend that the Hard Rock Units were not subject to ILSA

21 since the Units were not "lots" under ILSA and were subject to the Improved Lot

22 Exemption.

23 Plaintiffs move for partial summary judgment on the fifth cause of action on the

24 unfair competition law claim solely as to the "unlawful" prong against Tarsadia

25 Defendants.  Developer Defendants move for summary judgment on  all claims against

26 them including the first cause of action for violations of ILSA, third cause of action for

27 fraud, fourth cause of action for negligence and fifth cause of action for unfair

28 competition.  Defendant Playground Destination moves for summary judgment on all

1  claims against it which include the fourth cause of action for negligence and fifth cause

2  of action for unfair competition.

3  **Discussion**

4  **A.    Legal Standard for Federal Rule of Civil Procedure 56**

5          Federal Rule of Civil Procedure 56 empowers the Court to enter summary

6  judgment on factually unsupported claims or defenses, and thereby "secure the just,

7  speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477

8  U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings,

9  depositions, answers to interrogatories, and admissions on file, together with the

10  affidavits, if any, show that there is no genuine issue as to any material fact and that the

11  moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact

12  is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc.,

13  477 U.S. 242, 248 (1986).

14          The moving party bears the initial burden of demonstrating the absence of any

15  genuine issues of material fact. Celotex Corp., 477 U.S. at 323.  The moving party can

16  satisfy this burden by demonstrating that the nonmoving party failed to make a

17  showing sufficient to establish an element of his or her claim on which that party will

18  bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the

19  initial burden, summary judgment must be denied and the court need not consider the

20  nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60

21  (1970).

22          Once the moving party has satisfied this burden, the nonmoving party cannot rest

23  on the mere allegations or denials of his pleading, but must "go beyond the pleadings

24  and by her own affidavits, or by the 'depositions, answers to interrogatories, and

25  admissions on file' designate 'specific facts showing that there is a genuine issue for

26  trial.'"  Celotex, 477 U.S. at 324.  If the non-moving party fails to make a sufficient

27  showing of an element of its case, the moving party is entitled to judgment as a matter

28  of law.  Id. at 325.  "Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

Plaintiffs, Developer Defendants, and Playground filed motions for summary judgment on the ILSA and/or related state law causes of action.  Prior to determining whether ISLA was violated, the threshold issue determinative as to any cause of action is whether the Hard Rock Units are subject to the requirements under ILSA. Specifically, the Court must address whether the Hard Rock Units are "lots" under ILSA and whether the Improved Lot Exemption applies to this case.  These issues have not been addressed by the Ninth Circuit or by many of the district courts in the Ninth Circuit and are issues of first impression in this district and this Circuit.

**B.    Whether the Hard Rock Units are "Lots" Under ILSA**

All Defendants argue that the ILSA does not apply because the Hard Rock Units are not "lots" as contemplated under ILSA.  Plaintiffs contend that the units are "lots" and subject to the provisions of ILSA.

ILSA was originally enacted in 1968 to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers. See 15 U.S.C. § 1703.  "The disclosure requirements are designed to prevent fraud in interstate land transaction." De Luz Ranchos Inv., Ltd. v. Colwell Banker & Co., 608 F.2d 1297, 1302 (9th Cir. 1979).  To obtain this goal, ILSA imposes disclosure requirements on developers to protect purchasers from unscrupulous sales of undeveloped home sites. Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1446-67 (11th Cir. 1985).  Although Congress was primarily concerned with the sale of raw land, ILSA also applies to the sale of lots in subdivisions. Rogers

v. Wesco Props., LLC, No. CV 09-8149-PCT-MHM, 2010 WL 3081352, at *4 (D. Az Aug. 4, 2010) (citing Winter, 777 F.2d at 1447).

Under ILSA, a purchaser of a residential lot may pursue a cause of action against the developer or agent of the developer for violations of ILSA's registration and disclosure provisions. See 15 U.S.C. § 1709. To fall under the protections of ILSA, "a plaintiff must first show that he or she purchased a *lot* from a defendant who qualifies as a developer or developer's agent under the ILSA." Id. (emphasis added).

The term "lot" is not defined in the statute. The Regulations, promulgated by the Consumer Financial Protection Bureau ("CFPB"), and formerly the Department of Housing and Urban Development ("HUD"), the agencies responsible for administering and enforcing ILSA, have defined a "lot" as "any portion, piece, division, unit, or undivided interest in land located in any state or foreign country, if the interest includes the right to the exclusive use of a portion of the land." 12 C.F.R. § 1010.1.[1]

In providing further guidance on the term, "lot" and other provisions under ILSA, HUD published Guidelines in 1996. As to the term "lot," the Guidelines provide:

> If the purchaser of an undivided interest or a membership has exclusive repeated use or possession of a specific designated lot even for a portion of the year, a lot as defined by the regulations, exists. For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

61 Fed. Reg. 13596, 13602 (Mar. 27, 1996).

The CFPB, and formerly HUD, have consistently maintained that "lot" applies to condominium units. Berlin v. Renaissance Rental Partners, LLC, –F.3d –, 2013 WL 1859140, at *1 (2d Cir. May 6, 2013) (citing Land Registration, Formal Procedures, and Advertising Sales Practices, and Posting of Notice of Suspension, 38 Fed. Reg.

---

[1] "12 C.F.R. § 1010.1 was promulgated by the Consumer Financial Protection Bureau in 2011. The provision duplicates the same definition appearing at 24 C.F.R. § 1710.1, promulgated in 1973 by HUD." Berlin v. Renaissance Rental Partners, LLC, –F.3d –, 2013 WL 1859140, at *1 n. 2 (2d Cir. 2013).

23,866, 23,866 (Sept. 4, 1973); (Dkt. No. 81-5, Ps' Req. For Judicial Notice, Ex. C, CFPB's letter brief in <u>Berlin v. Renaissance Rental Partners, LLC,</u>, No. 12-2213, Mar. 12, 2013 at 14); <u>see also</u> 39 Fed. Reg. 7824 (1974); 44 Fed. Reg. 24,012 (1979).

Accordingly, federal courts have held that the term "lot" applies to units in a condominium building.  <u>Winter</u>, 777 F.2d at 1447-48; <u>Berlin</u>, –F.3d –, 2013 WL 1859140, at *1 (single floor condominium unit in multi-story building included the right to the exclusive use of a specific portion of the land was a "lot" within the meaning of ILSA).  The Court in <u>Smith v. Myrtle Owner, LLC</u>, 09cv1655-KAM(VVP), 2011 WL 2635717 (E.D.N.Y. Feb. 9, 2011) concluded that a high-rise condominium building is a "lot" under ILSA and explained,

> Other federal courts have followed suit.  <u>See, e.g.</u>, <u>Nu–Chan, LLC v. 20 Pine Street, LLC</u>, No. 09–cv–477, 2010 WL 3825734, at *2–*3 (S.D.N.Y. Sept. 30, 2010); <u>An v. Leviev Fulton Club LLC</u>, No. 09–cv–1937, 2010 WL 3291402, at *1 (S.D.N.Y. Aug.10, 2010); <u>Cruz v. Leviev Fulton Club, LLC</u>, 711 F. Supp. 2d 329, 331 (S.D.N.Y. 2010); <u>Beauford v. Helmsley</u>, 740 F. Supp. 201, 209 (S.D.N.Y. 1990); <u>see also</u> <u>Giralt v. Vail Village Inn Assocs.</u>, 759 P.2d 801, 805–06 (Colo. Ct. App.1988).  Some cases proceed on the assumption that the statute applies and address the applicability of certain exemptions to condominiums. <u>See</u> <u>Long v. Merrifield Town Center Ltd. Partnership</u>, 611 F.3d 240 (4th Cir. 2010); <u>Markowitz v. Northeast Land Co.</u>, 906 F.2d 100, 102 (3d Cir. 1990); <u>Romero v. Borden East River Realty LLC</u>, No. 09–cv–665, Slip Op. at 8 (E.D.N.Y. Mar. 11, 2010); <u>Bacolitsas v. 86th & 3rd Owner, LLC</u>, No. 09–cv–7158, 2010 WL 3734088, at *4 (S.D.N.Y. Sept. 21, 2010); <u>Bodansky v. Fifth on the Park Condo, LLC</u>, 732 F. Supp. 2d 281, 285 (S.D.N.Y. 2010) ("The parties agree that [the condominium] is subject to certain of the Act's provisions").  The court is not aware of any contrary authority holding the statute inapplicable to condominiums.

<u>Id.</u> at 2.  However, in <u>Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 127 F.3d 478, 481 (6th Cir. 1997), which Defendants' primarily rely on, the Sixth Circuit held that while recognizing that condominiums are "lots", individual interests in non-residential hotel condominiums subject to use restrictions are not "lots" within the meaning of ILSA.  <u>Id.</u>  The Sixth Circuit affirmed the district court's holding that the hotel interests were nonresidential condominium units subject to use restrictions.  <u>Id.</u>

Relying on the district court's findings, the Sixth Circuit noted that the units were largely non-residential and encumbered with numerous use restrictions so that the

investors did not have "exclusive use" of their hotel units.  Id.  When the units were purchased, they were already restricted for use as a hotel and never available for use at the discretion of the unit owner.  Id. at 482.  If the owners sold their units, they had to sell them as hotel rooms.  Id. at 480.  The investors were only allowed fourteen days per year in their units and only if the units were not previously rented.  Id. at 482.  "Alternate dates could be selected by the unit owner, but there is no guarantee that the unit will ever be available to him or her."  Becherer v Merrill Lynch, Pierce, Fenner & Smith, 920 F. Supp. at 1345, 1355 (E.D. Mich. 1996).  Lastly, the investor's right to ejects tenants was assigned to the hotel manager and "never truly resided with the unit owners."  Becherer, 127 F.3d at 482.  A paying guest could not be ejected merely because a unit owner wants his or her unit.  Id.  The Sixth Circuit noted that there was extensive evidence that limited the investors' right to use and possess their units.  Id.

Defendants contend that, similar to Becherer, there were use restrictions to the extent that Plaintiffs did not have "exclusive use" of their units.  Plaintiffs contend that the use restrictions were not as stringent as the facts in the Becherer case because the Rental Management Program ("RMP") was voluntary.  They contend that the critical question is whether an owner has exclusive use or possession of a specific designated lot even for a portion of the year and Plaintiffs had that right.

Here, the City of San Diego mandated restrictions on the ownership of the Units which included that 1) there is a 28 day occupancy limitation for each owner; 2) the Units could only be sold as non-residential condominium units with a right of first refusal in favor of the Hotel; and 3) the Units were to be managed as part of the Hotel. These restrictions were disclosed in the Unit Maintenance and Operations Agreement, ("UMA")[2], and the Final Subdivision Public Report, File No. 120249LA-F22, issued

---

[2]The UMA states:

3.1 Restriction on Use.  Notwithstanding anything set forth in this Agreement to the contrary, as mandated by the City of San Diego, Unit Owner acknowledges and agrees that (a) the Unit may be sold individually only as a "non-residential condominium unit", (b)

by the Department of Real Estate on April 4, 2006 ("Public Report").[3]  In the UMA, it is undisputed that keys, housekeeping, furnishings, linens, telephones, cable television, and numerous other issues remained under the control of the Seller.

A Declaration of Restriction was also recorded with the County of San Diego on January 30, 2006.  (Dkt. No. 94-15, Ds' Appx. of Exs. No. 40 at 130-31.)  It similarly states that the City "requires that any occupancy of the Room Units by the Room Unit Owners be restricted and that the Room Units be made available to the public for transient rental through the Hotel when not occupied by the Room Unit Owners." (Id. at 130-31.)  Similar to the UMA, it further stated that the "restrictions . . . shall be in perpetuity and are intended to run with the land and shall be binding upon each Room Unit and each Room Unit Owner and his or her assigns, transferees and successors." (Id. at 131.)

As to management of the Units, the buyers had a voluntary choice to decide whether they opted for the Rental Management Agreement ("RMA"), offered by Tarsadia, the operator of the Hotel.  While voluntary, all the named Plaintiffs, and many buyers, executed RMAs with Tarsadia.  The voluntariness and timing of the RMAs is the key to determining whether the buyers had "exclusive use" of its facilities.

---

occupancy of the Unit by Unit Owner and its transferees, successor and assigns shall be limited to an aggregate maximum of twenty-eight (28 days during each calendar year, and (c) at all times, the Unit shall be managed as part of the Hotel.

(Dkt. No. 94-9, Ds' Appx. of Exs. No. 7, 15 ¶ 3.1.)

[3]The Final Subdivision Public Report issued by the Department of Real Estate on April 4, 2006 also provided that "as required by the City of San Diego zoning designations, the room units are designated as 'commercial dwelling units,' and as such, are subject to occupancy limitations.  An owner of a room unit shall be able to occupy his or her room unit for a maximum of twenty eight (28) days a year, all reserved in accordance with the reservation policies and procedures of the project." (Dkt. No. 94-15, Ds' Appx. of Exs. No. 36, Public Report at 5.)

While the RMAs[4] significantly limit the right of the owner to use and enjoy the unit

[4]The RMAs provided that:

> Owner hereby appoints Operator as Owner's exclusive rental management agent for the Unit, with the sole and exclusive authority to manage, operate, market and rent the Unit, and to conduct all negotiations for the rental and use of the Unit, all in accordance with the terms set forth in this Agreement and the Program, and Operator hereby accepts such appointment. Owner hereby relinquishes control of the Unit to Operator, and covenants and agrees that, during the Term hereof and during any Rental Commitment thereafter, Operator shall have sole possession, management, operation and control of the Unit. Subject to Owner's use of the unit as permitted by and pursuant to this Agreement, Operator shall determine whether to allow a Guest's transient occupancy of the Unit and the terms of such occupancy. Operator and its employees, agents, contractors, licensees and assigns may enter the Unit, without Notice to Owner, from time to time, and at any time, for any purpose set forth in this Agreement and in connection with the operation of the Program.

(Dkt. No. 104-12 at 12, Ds' Appx. of Exs. No. 12 at 3, section II.)

> Paragraph 3.2 states:

> Rental of the Unit.  Operator reserves the right to vary the frequency and length of the rental of the Unit for any reason, including, but not limited to, the following: (a) a particular size, feature, view, location or type of guestroom requested by a Guest; (b) prior reservation or other occurrence making the Unit unavailable for a duration of occupancy desired by a Guest; (c) the needed or ongoing repair or replacement activities or unsuitability of the Unit for rental; (d) the physical condition or amenities of the Unit; (e) the personal usage of the Unit by Owner or a Guest of Owner; and (f) any other factors affecting demand for or availability or desirability of the Unit. . . .Operator reserves the right to move a Guest from the Unit, write-off amounts owed, or adjust the rental rate to a lesser amount, if a Guest is dissatisfied or otherwise requests the same for any reason.

(Id. at 13, Ds' Appx. of Exs. No. 12 at ¶ 3.2.)  As for the owner's use,

> Owner . . . may not occupy and use the Unit for an aggregate of more than twenty-eight (28) days during each calendar year of the Term . . . unless such occupancy and use is as a paying Guest at the Hotel. Owner shall have not right to use or occupy the Unit or any facilities of the Hotel, except during those periods in which Owner is entitled to the use and occupancy of the Unit as specifically provided herein. Owner acknowledges and agrees that during any period that the Unit rented to a Guest, the Guest shall be entitled to the exclusive right of use and occupancy of the Unit." (Id. at 16 ¶ 4.1.)  The Owner's right to reserve the Unit for use is also conditioned on the fact that the Unit is not subject to a rental commitment for any portion of the time of owner's desire use; the operator receives at least 24 hours advanced notice and the Unit is otherwise available for use by Owner. (Id. at 16-

similar to the units in <u>Becherer</u>, the fact that it was voluntary and was signed sometime after the Purchase Contract distinguish it from <u>Becherer</u>.

In <u>Becherer</u>, the units were subject to the extensive use restrictions at the time the investors purchased them." <u>Becherer</u>, 920 F. Supp. at 1355.  In this case, Plaintiffs had the voluntary choice to use Tarsadia as its management company.  If Plaintiffs chose not to utilize Tarsadia, it would not be subject to the restrictive RMA on use and occupancy.  Moreover, while the RMAs were eventually signed by all Plaintiffs, they were not signed until months after the Purchase Contract was signed.

At the time of the signing of the Purchase Contract, there were only three express use restrictions that limited each buyer to 28 days of use per year; requiring that the Unit be sold individually only as a "non-residential condominium unit; and that the Unit be managed as part of the Hotel.  Besides limiting the buyer to 28 days per year, no other restrictions affected Plaintiffs' right to use and enjoy the units.  As defined under the Regulations and the Guidelines, Plaintiffs had a 28 day "exclusive repeated use or possession of a specific designated lot even for a portion of the year."  <u>See</u> 61 Fed. Reg. at 13602.  Accordingly, the Court concludes the Hard Rock Units are "lots" subject to the ILSA.

## C.    Whether the Improved Lot Exemption Applies

Developer Defendants and Playground argue that since the Improved Lot Exemption applies to the Hard Rock Units, the requirements of ILSA do not apply. Plaintiffs contend that the two year completion exemption is illusory because the Seller could terminate "without liability."

ILSA and its accompanying regulations make it unlawful for a developer to use the mail or other instruments of interstate commerce to sell certain property, unless the

---

17 ¶4.3(a)-(c).)  Moreover, the Owner's use is also conditioned on establishing a credit account at the Hotel for charges incurred at the Hotel.  (<u>Id.</u> at 16 ¶ 4.3.)  If credit information is not provided or is not valid or Owner fails to provide satisfactory cash deposit, Operator is authorized to deny Owner access to the occupancy of the Unit.  <u>Id.</u>

[11cv1842 GPC(KSC)]

property has been registered with HUD and the buyer has been provided a "Property Report" prior to signing a purchase agreement. 15 U.S.C. §§ 1702, 1703;[5] 24 C.F.R. §§ 1710.105(d)(2)(iii)-(iv). If the required property report "has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing and such contract or agreement shall clearly provide this right." 15 U.S.C. § 1703(c). Finally, 15 U.S.C. § 1703(d)(2) provides a similar two-year right of rescission where the sales contract does not include certain required provisions, such as a 20-day right to cure defaults or breaches.[6]

However, an exemption, also known as the Improved Lot Exemption, from the disclosure requirements under ILSA applies to "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." Id. § 1702(a)(2). Courts narrowly construe the exemptions under ILSA and it is the defendants' burden to demonstrate that an exemption applies. Gentry v. Harborage Cottages-Stuart, LLP, 654 F.3d 1247,

---

[5]The ILSA prohibits the sale or lease of any lot unless a printed property report "has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement for sale or lease by the purchaser or lessee." 15 U.S.C. § 1703(a)(1)(B).

[6]15 U.S.C. § 1703(d)(2) provides:

(D) Additional authority for revocation of nonexempt contract or agreement at option of purchaser or lessee; time limit; applicability

Any contract or agreement which is for the sale or lease of a lot not exempt under section 1702 of this title and which does not provide–

(2) that, in the event of a default or breach of the contract or agreement by the purchaser or lessee, the seller or lessor (or successor thereof) will provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date of the receipt of such notice . . . may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement.

15 U.S.C. § 1703(d)(2).

[11cv1842 GPC(KSC)]

1258-59 (11th Cir. 2011).

In its analysis, the Court looks to federal and state law.  Baroi v. Platinum Condo. Dev., LLC, 874 F. Supp. 2d 980, 984 (D. Nev. 2012) (citing Stein v. Paradigm Mirasol, LLC, 586 F.3d 849, 854 (11th Cir. 2009)).  First, the Court analyzes ILSA under federal law to determine the term "obligating."  Id.  A contract "obligates" completion within two years when it "imposes a legal duty on the developer to perform his promise to construct the condominium or other building within two years."  Id.  "A legal duty, contractual or otherwise, is one that the law will require a party to perform, or to pay for not performing, by bringing to bear public force."  Id.

Next, state law will determine "whether the contractual obligation is one which the relevant state law will require the seller to perform" and what remedies the buyers would have under the contract.  Id. (stating that if state remedies such as "specific performance or rescission plus reimbursement and actual damages are available, then the contract obligates completion within two years.").

"Additionally, the contractual duty must be one that does not render illusory the promise to erect the building within two years."  Id.  "A contractual promise to build within two years may be illusory if the contract provides a mechanism for the seller to evade the requirement for reasons that are within the seller's discretion or control."  Id.  Even if a contract "excuses delays beyond the seller's control, it is still one 'obligating' [the seller] to complete construction of the condominium within two years for purposes of § 1702(a)(2) of the Disclosure Act."  Stein, 586 F.3d at 858.

HUD Guidelines also provides some guidance as to the application of the Improved Lot Exemption.  "HUD consistently has taken the position that for a lot sale to be eligible for the exemption under section 1702(a)(3), the seller's obligation to construct must be real and not illusory, and must be obligatory except for the conditions described in these guidelines." 61 Fed. Reg. at 13598.  In addition,

> [the] contract must not allow nonperformance by the seller at the seller's discretion.  Contracts that permit the seller to breach virtually at will are viewed as unenforceable because the construction obligation is not an obligation in reality.  Thus, for example, a clause that

provides for a refund of the buyer's deposit if the seller is unable to close for reasons normally within the seller's control is not acceptable for use under this exemption. Similarly, contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct.

(Id. at 13603.)

In this case, the Purchase Contract states "[n]otwithstanding anything to the contrary contained herein, the Closing must occur not later than December 29, 2007 (the 'Outside Date'). If the closing shall not have occurred as of the Outside Date, Buyer shall be entitled to terminate this Contract pursuant to the terms of Section 4.2(i) hereof." (Dkt. No. 94-8, Ds' Appx. of Exs. No. 5 at 90 ¶ J2.) In addition, the Purchase Contract states that "except for delays caused by circumstances beyond Seller's reasonable control or the failure to complete due to a permitted excuse, Seller shall use commercially reasonable efforts to complete the construction for the Units by the Estimated Completion Date of Unit." (Id. at 99 ¶ 20(b).)[7]

The parties do not dispute that the purchase contract provides for completion of the Hard Rock within two years but disagree on whether the conditions for seller's right to cancel render the two year requirement illusory. Plaintiffs allege that Defendants had several unilateral rights to terminate the Purchase Contract "without liability" making the purported two year completion promise illusory. Specifically, Plaintiffs contend that sections 4.2(ii)(d), and 4.2(iii) along with 4.2(ii)(b), of the Purchase Contract, gave Seller the unilateral right to terminate the Purchase Contract without obligation. Defendants argue that the Purchase Contract mandates completion of the Units within two years and the other provisions in the contract do not render the obligation illusory as they are conditions outside the Seller's control and Plaintiffs are still afforded the remedies of specific performance and damages.

The Court looks to California state law to determine "whether the contractual

---

[7]The Purchase Contracts were signed between May and December 2006, less than 2 years before the Outside Date. All of the Plaintiffs but one closed escrow between October and December 2007.

[11cv1842 GPC(KSC)]

obligation is one which the relevant state law will require the seller to perform" and what remedies the buyers would have under the contract.  See Baroi, 874 F. Supp. 2d at 984.  A contract is to be construed as a whole, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.  A contract is illusory if a "party reserves the unqualified right to cancel or withdraw from an agreement at his or her pleasure."  1 Witkin, Summary of California Law § 231 (10th ed. 2005); Money Store Inv. Corp. v. S. California Bank, 98 Cal. App. 4th 722, 728 (2002) (An agreement is illusory and lacks mutuality where one party has no definite obligation to perform under the agreement.).  While the general rule is that a right to cancel renders a promise illusory and unenforceable, it is not necessary that the obligations be equal, but only that they be mutual.  1 Witkin, Summary of California Law § 234 (10th ed. 2005).  Therefore, "if the right to cancel is in some way restricted, e.g., where a party may cancel for cause, or upon the occurrence of some extrinsic event, or by giving notice for a substantial period of time, consideration will be found."  Id.  "A cancellation provision conditioned on the subsequent occurrence of some specified event, not solely within the control of the promisor, does not destroy mutuality of obligation."  Id.; Forecast Homes, Inc. v. Steadfast Ins. Co., 181 Cal. App. 4th 1466, 1483 (2010) (quoting Asmus v. Pac. Bell, 23 Cal. 4th 1, 15 (2000) ("[a] contract is illusory if performance is 'condition[ed] on some fact or event that is wholly under the promisor's control and bringing it about is left wholly to the promisor's own will and discretion.'")).

Moreover, "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement."  Brown v. Superior Court, 34 Cal. 2d 559, 568 (1949); see also Foley v. Interactive Data Corp., 47 Cal. 3d 654, 683 (1988) (citing Rest. 2d Contracts § 205).  This prevents one contracting party from "unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 349 (2000) (emphasis omitted).  The covenant is

read into the contract in order to protect the express promises of the contract. <u>Foley</u>, 47 Cal. 3d at 690.  However, an implied covenant is not read into a contract if it varies the express terms of the contract.  <u>Wolf v. Walt Disney Pictures and Television</u>, 162 Cal. App. 4th 1107, 1120 (2008) (courts will not read into a contract an implied covenant of good faith and fair dealing if the express purpose of the contract is to grant unfettered discretion and the contract is otherwise supported by adequate consideration and the conduct is within the reasonable expectation of the parties).

Therefore, an implied covenant of good faith and fair dealing is sufficient to avoid a finding that a promise is illusory. <u>See</u> <u>Asmus v. Pacific Bell</u>, 23 Cal.4th 1, 16 (2000) (employer's right to unilaterally modify employment agreement does not make agreement illusory); <u>Badie v. Bank of America</u>, 67 Cal. App. 4th 779, 787–788 (1998) (contracting party with unilateral right to modify contract does not have "carte blanche to make any kind of change whatsoever"; unilateral right to modify, when limited by the implied covenant of good faith and fair dealing, requires the party holding the power to affect the other party's rights to exercise it in a manner consistent with the reasonable contemplation of the parties at the time of the contract.).  An unqualified right to modify or terminate the contract is not enforceable; however, "the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of power is subject to limitations, such as fairness and reasonable notice." <u>Asmus</u>, 23 Cal. 4th at 15-16.

### 1.    Unilateral Discretion to Terminate the Purchase Contract

### a.    Failure to Obtain Certificate of Occupancy, § 4.2(iii)

Plaintiffs contend that section 4.2(iii), which allows the seller to terminate the Contract if they fail to complete the Unit and obtain a Certificate of Occupancy ("C/O") by the Outside Date, in conjunction with section 4.2(ii)(b), which allows the Seller to terminate without liability if the seller has a unilateral right to terminate the contract under any other provisions, make the two year obligation illusory.  They assert that Defendants could simply delay obtaining the C/O until after the Outside Date and then

cancel the contract to escape liability. Therefore, since section 4.2(iii) grants Defendants the unilateral right to terminate, Seller can terminate without liability, and the obligation to build within two years is illusory. In opposition, Defendants contend that the provision does not render obligation to build illusory because issuance of a C/O is not entirely within the developer's reasonable control but is dependent on the City of San Diego signing off on the C/O based on inspections.

Courts have held that the improved lot exemption applies even if there are delays based on circumstances beyond a seller's control. In re Mona Lisa At Celebration, LLC, 472 B.R. 582, 610 (M.D. Fla. 2012) (citing Van Hook v. the Residences at Coconut Point, LLC, 364 Fed. Appx. 549 (11th Cir. 2010)). In Baroi, the court explained that while "any fire, explosion, or labor dispute could be within Defendants' control, the contract does not allow an extension of the time of performance unless the reason is beyond Defendants' control. Baroi, 874 F. Supp. 2d at 985. However, to "the extent any fire, explosion, or labor dispute was within Defendants' control, . . . [the force Majeure provision] would not excuse a delay in performance." Id.; Stefan v. Singer Island Condo, No. 08-80039-CIV, 2009 WL 426291, at *7 (S.D. Fla. Feb. 20, 2009) (same).

Section 4.2(iii) of the Purchase Contract states:

> FAILURE TO OBTAIN CERTIFICATE OF OCCUPANCY. If Seller has failed to complete the Unit and obtain a Certificate of Occupancy on or before the Outside Date Seller may cancel the Escrow and Escrow Holder shall refund to Buyer the Escrow Deposit within fifteen (15) days following receipt of such notice of cancellation.

(Dkt. No. 94-8, Ds' App. of Exs. No. 5 at 94 § 4.2(iii).) In addition section 4.2(ii)(b) states that "Seller may terminate this Contract . . . without liability if : . . . Seller has the unilateral right to terminate this Contract under any other provision hereof. . . ." (Id. § 4.2(ii)(b).)

This provision provides two conditions before Seller may cancel: 1) if Seller has failed to complete the Unit and 2) if Seller fails to obtain a C/O on or before the Outside Date. Seller has partial control over whether this provision applies based on

1   its ability to complete to Unit.  However, the express language of the Purchase Contract
2   also states that the seller will "use commercially reasonable efforts to complete the
3   construction of the Units by the Estimated Completion Date of Unit."  Therefore, the
4   implied good faith and fair dealing imposes an obligation on the Seller to proceed
5   diligently under the contract.  See Bleecher v. Sirpuhe Philibosian Conte, 29 Cal. 3d
6   345, 351 (1981) (buyers did not have unfettered right to cancel their contract or ignore
7   their contractual obligations as the express and implied obligation to proceed in good
8   faith obligated the buyers to proceed diligently under the contract and to refrain from
9   withholding their approval unreasonably.)

10      In Bleecher, plaintiffs, who were the buyers, and defendant, who was the seller,
11   entered into a contract for the buyers to purchase 40 acres of unimproved land.  Id. at
12   348.  Escrow was opened where buyers deposited $1000.00 pursuant to the contract.
13   Id. at 349.  Subsequently, the defendant refused to sign the escrow instruction unless
14   the buyers would pay the entire purchase price before the end of the calendar year.  Id.
15   Buyers brought suit for specific performance since defendant's new demand for the
16   entire purchase price was not part of the agreement.  Id.  Defendant argued that the
17   contract was not enforceable because the buyers' promise was illusory since they
18   assumed no real obligations under the agreement.  Id. at 350.  According to the
19   contract, escrow was scheduled to close the day after the final tract map was recorded
20   by the buyers.  Id. at 348.  The buyers also agreed to "do everything in their power to
21   expedite the recordation of the final map and [to] proceed with diligence."  Id.  The
22   buyers' obligation to pay was contingent upon their approval of the title report, plat
23   map, and soil, zoning and engineering reports.  Id.

24      The seller argued that the buyers could decline to have a track map prepared or
25   to obtain city approval for development, renege on the agreement, and still get back
26   their deposit.  Id. at 350-51.  The court noted that the seller overlooked the buyers'
27   promise to "do everything in their power to expedite the recordation of the final map"
28   and to "proceed" with diligence."  Id. at 351. Therefore, the "contract would have no

[11cv1842 GPC(KSC)]

value to the buyers if they did not proceed in good faith and obtain the necessary reports and approvals." Id.  The California Supreme Court held the obligations under the contract were not illusory since they were based on the express and implied obligations to proceed in good faith.  Id. at 352.  "The buyers had an enforceable obligation to proceed diligently with the recordation of the tract map and to obtain the city's approval to develop the property."  Id. at 352; see also Converse v. Fong, 159 Cal. App. 3d 86, 90 (1984) (a "party whose performance is subject to a satisfaction clause is under an implied duty to use good faith and diligence in performing").

Here, contrary to Plaintiffs' argument that Defendants could simply delay obtaining a C/O, the Purchase Contract contains an express provision requiring the sellers to "use commercially reasonable efforts to complete the construction of the Units by the Estimated Completion Date of Unit," and an implied covenant to proceed in good faith.  Therefore, the sellers had an enforceable obligation under the contract. See Bleecher, 29 Cal. 3d at 351.

Moreover, obtaining a C/O under the Seller's right to cancel is not a requirement within the seller's discretion or control since it is based on approval by the City of San Diego.  Sellers do "not have an unfettered right to cancel their contract or ignore their contractual obligation" under the C/O provisions of section 4.2(iii).  See Moreland Dev. Co. v. Gladstone Holmes, Inc., 135 Cal. App. 3d 973, 977 (1982) (contract not illusory where contract conditioned on board approval).

In conclusion, the C/O provision does not grant Seller unfettered discretion to cancel the contract without obligation.  Accordingly, section 4.2(iii) does not render the two year requirement to build illusory.

### b.  Remedy of Specific Performance or Damages

Plaintiffs argue that the section 4.2(ii)(b), which allows Defendants to cancel "without liability" if seller has the unilateral right to terminate this Contract under any other provision hereof, together with sections 4.2(ii)(d) and 4.2(iii) deny buyers the remedies of specific performance or damages.  Defendants argue that specific

[11cv1842 GPC(KSC)]

performance and damages are not excluded from the Purchase Contract.

In California, where "a contract expressly provides a remedy for a breach thereof, the language used in the contract must clearly indicate an intent to make the remedy exclusive." Nelson v. Spence, 182 Cal. App. 2d 493, 497 (1960). "When a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law." McDonald v. Stockton Met. Transit Dist., 36 Cal. App. 3d 436, 442 (1973). California Civil Code section 3384, stating "the specific performance of an obligation may be compelled" provides for specific performance of any contract for the sale of land since land is considered unique. Reiner v. Hermann, 79 Cal. App. 2d 543, 546 (1947); Glynn v. Marquette, 152 Cal. App. 3d 277, 280-81 (1984).

California Civil Code section 3387 also provides:

> It is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation. In the case of a single-family dwelling which the party seeking performance intends to occupy, this presumption is conclusive. In all other cases, this presumption is a presumption affecting the burden of proof.

Cal. Civ. Code § 3387. There is a presumption that damages are an inadequate remedy for breach of an agreement to transfer real property. Id.; Kaufman v. Goldman, 195 Cal. App. 4th 734, 743 (2011).

In addition California Civil Code section 3306 provides:

> The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach, the expenses properly incurred in preparing to enter upon the land, consequential damages according to proof, and interest.

Cal. Civ. Code § 3306.

The Guidelines also state:

> Thus, for example, a clause that provides for a refund of the buyer's deposit if the seller is unable to close for reasons normally within the seller's control is not acceptable for use under this exemption.

[11cv1842 GPC(KSC)]

1   Similarly, contracts that directly or indirectly waive the buyer's right
2   to specific performance are treated as lacking a realistic obligation to
    construct.

3   61 Fed. Reg. at 13603.

4   In a Fourth Circuit case, the real estate contract provided that "[i]f settlement

5   shall not have occurred within the [24-month] period allowed in Section 8 due to

6   reasons within [Midtown's] control, [Ndeh] shall have the option of either: (i)

7   terminating this [contract] by written notice to [Midtown] . . . , in which event

8   [Midtown] shall . . . cause the [$50,000 deposit] . . . to be returned to [Ndeh], and

9   *neither party shall have any further liability or obligation hereunder*; or (ii) electing

10  to proceed with the purchase of the Condominium Unit when the same is available."

11  Ndeh v. Midtown Alexandria, LLC, 300 Fed. Appx. 203, 206 (4th Cir. 2008) (emphasis

12  added).  The Fourth Circuit held that nothing in the provisions excluded the remedy

13  of specific performance under Virginia law.[8]  Id. at 207.  The Court explained that the

14  contract did not include any clear language of exclusivity such as the plaintiff shall

15  have "only" the listed remedies or that he is "limited to" the listed remedies.  Id. at 207.

16  In California, specific performance is also the preferred remedy as land is unique.  See

17  Union Oil Co. of Cal. v. Greka Energy Corp., 165 Cal. App. 4th 129, 136 (2008).

18  In a 5th Circuit case, the court held that language in a default provision stating

19  "PURCHASER shall be entitled to a refund of his downpayment as well as any other

20  monies he may have advanced SELLER" did not limit buyer's remedies available

21  under the contract.  Hilman v. Loga, 697 F.3d 299, 304 (5th Cir. 2012)  This provision

22  does not prevent buyers from seeking damages or specific performance.  Id. at 305.

23  The cases that Plaintiffs cite in support of their argument that sellers were not

24  obligated to complete construction within two years specifically used language to limit

25  the buyers' remedies.  See Dalzell v. Trailhead Lodge at Wilhorse Meadows, LLC, No.

26  09cv 26140REB-KLM, 2010 WL 3843464, at *3 (D. Col. 2010) (where the casualty

27

28  [8]Under Virginia Law, each piece of real estate is unique and specific
    performance is the preferred remedy where real property is involved.  Ndeh, 300 Fed.
    Appx. at 207 (citations omitted).

provision giving seller discretion to terminate the contract as a result of "casualty by fire or otherwise occurring prior to Closing" and besides the return of buyer's deposit buyer "acknowledges that Buyer shall have *no other remedy* because of such damage and the parties shall be released from all other obligations under this Agreement . . . ." negated the buyer's remedy of specific performance); Aboujaoude v. Poinciana Dev. Co., II, 509 F. Supp. 2d 1266, 1271  (S.D. Fla. 2007) (limiting plaintiffs' "sole remedy" to the return of their deposit); DeLaura v. Lennar Homes, No. 2:08cv965-FtM-29DNF, 2009 WL 2181251, at *3 (M.D. Fla. 2009) (provision used "Purchaser's sole remedies" and court held that this negated buyer's right to specific performance and rendered obligation to complete construction in two year illusory); Taylor v. Morrison Homes, Inc., 67 So. 3d 224, 226 ( Fla. App. 2 Dist.  2010) (court held that two year contract to build provision was illusory because broader liquidated damages clause which allowed sellers to rescind "for any reason whatsoever or for no reason" and remedy restricted to a refund of her earnest money plus $500 in liquidated damages).

However, in this case, there is no exclusive language limiting the buyers' remedies in sections 4.2(ii) and 4.2(iii) of the Purchase Contract.  See Ndeh, 300 Fed. Appx. at 206.  While the Purchase Contract states that the Seller may terminate "without liability," Plaintiffs have not provided any authority that "without liability" excludes the remedy of specific performance or damages. See id.  Moreover, sections 4.2(ii) and 4.2(iii) allow the return of buyer's escrow deposit and courts have held such provisions do not limit the buyers from seeking specific performance or damages.  See Hillman v. Loga, 697 F.3d 299, 304-05 (5th Cir. 2012).  Thus, sections 4.2(ii)(b), in conjunction with  4.2(ii)(d) and 4.2(iii), do not make the two year obligation to complete construction illusory.

### c.    Sales Quota Contingency, § 4.2(ii)(d)

Plaintiffs assert that section 4.2(ii)(d), which allows the seller to terminate the contract if less than 75% of the units are under binding contract or sold by the time of closing, is illusory because it is not limited by an express 180 day period as required

by the Regulations. Defendants maintain that section 4.2(ii)(d) relates to events outside the seller's control, and therefore, is not illusory. Second, Defendants argue that the exemption still applies to a contract that contains a sales quota contingency even if the contract does not limit the period for that contingency to 180 days. Lastly, reliance solely on HUD regulations and guidelines is not controlling or persuasive.

The Regulations provide, "[i]f the sale involved a condominium or multi-unit construction, a presale clause conditioning the sale of a unit on a certain percentage of sales of other units is permissible if it is legally binding on the parties and is for a period not to exceed 180 days. However, the 180-day provision cannot extend the 2-year period of performance." 24 C.F.R. § 1710.5. The Guidelines also similarly state "[a]lso permissible, in the case of multi-unit construction, is a clause conditioning the completion of construction or closing of title on a certain percentage of sales of other units. The presale period cannot exceed 180 days from the date the first purchaser signs a contract in the project or, in a phased project, from the date the first purchaser signs a sales contract in a phase. Such a clause may not extend the overall two-year obligation to construct." 61 Fed. Reg. at 13603.

Defendants cite to a district court case in support of their argument that the ILSA exemption to a sales quota contingency applies even although the contract itself did not limit the period to 180 days. See Pilato v. Edge Investors, LP, 609 F. Supp. 2d 1301, 1309 (S.D. Fla. 2009) (sales quota provision stated "[n]otwithstanding the foregoing or any other contrary provision of the Agreement, Seller shall have the right, in Seller's sole discretion, to cancel the Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least eighty percent (80%) of the Units in the Condominium."). Defendants assert that the district court held that the sales quota provision, which did not contain the 180 day period, was subject to the ILSA exemption. See id.

In researching this issue, the Court looked at the specific purchase contract at issue in Pilato. The district court in Pilato did not cite to the entire sales quota

[11cv1842 GPC(KSC)]

provision.  In fact, in <u>Pilato</u>, the purchase contract contained the following presale contingency provision:

> Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right, in Seller's sole discretion, to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least eighty percent (80%) of the Units in the Condominium.
>
> Seller must, however, notify Buyer of such a termination no later than *one hundred eighty (180) days* following the date on which the first purchaser of a Unit 'n the Condominium executes a binding purchase agreement for such Unit, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement.

<u>Pilato v. Edge Investors, Inc., LP</u>, 08cv80796-DMM, Dkt. 1, Compl., Ex. A at 13 (S.D. Fl. July 16, 2008) (emphasis added).  Based on the contract provision that limited the presale contingency provision to 180 days, the court held that the provision did not make the obligation to build within two years illusory.  <u>Id.</u>  Other courts have held the same.  <u>Goodman v. Platinum Condo. Dev., LLC</u>, No. 2:09cv957-KJD, 2012 WL 1190827, at *2-3 (D. Nev. Apr. 10, 2012) (Guidelines "provide that pre-sale contingencies do not prevent application of the ILSA two-year exemption as long as the period is strictly within the 180-day period after the first condominium unit sale."); <u>Snavely Siesta Ass., LLC v. Senker</u>, 34 So. 3d 813, 816-817 (2d Dist. Fl. 2010); <u>see also</u> <u>Long v. Merrifield Town Ctr. Ltd. Partnership</u>, 611 F.3d 240, 246 (4th Cir. 2010).

In this case, the Purchase Contract states that "Seller may terminate this Contract and cancel Escrow, without liability, if . . . (d) less then seventy-five percent (75%) of the Room Units . . . to be constructed . . . have sold or are under binding contract for sale to third parties as of the Closing Date; . . . ." (Dkt. No. 94-8, Ds' App. of Exs. No. 5 at 94 § 4.2(ii)(d).)

Because the pre-sale contingency does not state that the contingency cannot exceed 180 days from the first sale, the Court concludes that section 4.2(ii)(d) provision renders the two year obligation to build illusory.  As such, the Improved Lot Exemption does not apply and the Units are subject to ILSA.  Since ILSA applies to

[11cv1842 GPC(KSC)]

1  the Units, the Court turns to whether there was a violation of the anti-fraud provisions

2  of ILSA, the sole cause of action alleged under ILSA.

3  **D.      Anti-Fraud Provisions of ILSA, 15 U.S.C. § 1703(a)(2)(A)-(C)**

4        Tarsadia Defendants argue that Plaintiffs cannot demonstrate the elements of

5  fraud as to knowledge of falsity and intent to defraud.  Plaintiffs contend that they have

6  raised genuine issues of material fact as to whether Tarsadia Defendants and/or

7  Greenberg Traurig,[9] their counsel for drafting the Purchase Contract, knew or

8  recklessly disregarded the probability that ILSA applied to the Hard Rock Units and

9  whether they intended that the purchasers would rely on those false statements and

10  omissions.

11        Plaintiffs allege violations of § 1703(a)(A), (B), and (C).  These provisions

12  provide:

> (a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails– . . .
> (2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title--
>
> (A) to employ any device, scheme, or artifice to defraud;
>
> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;
>
> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser

22  15 U.S.C. § 1703(a)(2)(A)-(C).

23        In California, a claim of fraud requires that: "(1) the defendant falsely

24  represented, concealed or failed to disclose a past or existing material fact; (2) the

25  defendant knew the representation was false at the time it was made; (3) in making the

---

[9]Plaintiffs cite to California Civil Code section 2332 which states that knowledge of an agent is imputed to a principal for the argument that Greenberg Traurig's knowledge imputed to Tarsadia Defendants.  Defendants have not opposed this proposition.

representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably and reasonably relied on the representation; and (5) the plaintiff suffered resulting damages." Irving v. Lennar Corp., No. Civ. S-12-290 KJM EFB, 2013 WL 1308712, at *10 (E.D. Cal. Apr. 1, 2013) (applying California fraud standard on ILSA anti-fraud claim) (citing Lazar v. Superior Court, 12 Cal.4th 631, 638 (1996)); Dexter v. Lake Creek Corp., No. 7:10-cv-226-D, 2013 WL 1898381, at *6 (May 7, 2013) (elements of state fraud cause of action applicable to ILSA's anti-fraud provision).  In an ILSA anti-fraud cause of action, there is no need to show reliance for violations of the fraud provisions of the ILSA.  Keanneally v. Bank of Nova Scotia, 711 F. Supp. 2d 1174, 1186 (S.D. Cal. 2010) (J. Hayes); see also Irving, 2013 WL 1308712, at *11.

Defendants argue that since they had never been involved in the construction or sale of condominiums or hotel-condos prior to the Hard Rock Project, they hired the law firm of Greenberg Traurig, an international law firm specializing in condo hotel projects, to assist in drafting the purchase and sale documents.  They were informed that they did not need to comply with ILSA because the Project fell under the Improved Lot Exemption.  Thus, Greenberg never told them about the 20 day opportunity for a buyer to remedy a default or breach of contract, and if the provision was omitted, then a buyer may be afforded an absolute two year right to rescind the purchase agreement from the date he signed it.  They were also informed that they did not need to submit a property report to HUD because ILSA did not apply to the Project.  They were unaware of any rescission rights the buyers may have had.  Therefore, when they communicated with the buyers to request that they close escrow or lose their deposits, they had no knowledge that the statements were false.

In support, they present the deposition of Greenberg Traurig attorney, Richard Davis, who testified that the firm advised Tarsadia representatives about the two year exemption and provided advice about taking steps to comply with the two year exemption in order to exempt the project from ILSA.  (Dkt. No. 94-11 at 146, Vaz Decl., Davis Depo. at 44:2-44.)  Greenberg Traurig advised Tarsadia that they needed

to provide a fixed date or an outside date of completion within two years from the date of signing of each contract and that the obligation to deliver the unit within the two-year period must not be illusory. (Id. at 46:1-23.) He explained "it had to actually be capable of being the subject of action by the buyers by exercise of a remedy provided under the contract." (Id. at 18-20.) Greenberg Traurig and Tarsadia Defendants discussed how to establish an enforceable promise so it would not be illusory. (Id. at 69:3-15.) Davis testified that he never advised Tarsadia that they were obligated under ILSA to include a 20 day opportunity for a buyer to remedy a default or breach of contract and did not advise that if the developer omitted the notice provision, then the buyer is afforded an absolute two year right to rescind the purchase agreement from the date he signed it. (Id. at 102:4-14.) He did inform Tarsadia Defendants that they would be exempt from being required to provide the California public report to HUD. (Id. at 104:10-24.)

Davis explained that Tarsadia was informed that the offering of the condominium interest had to be registered with the California Department of Real Estate. (Dkt. No. 98-5, Benjamin Decl., Ex. 9, Davis Depo at 65:19-24.) He testified that there was a decision/agreement after multiple conversations with Tarsadia's General Counsel, Ed Coss, to seek qualification under an exemption from the law. (Id. at 67:4-68:2.) Davis advised Tarsadia that in order to seek an exemption from ILSA, the purchase agreement had to include an obligation to deliver the condominium units within two year from the date of signing the agreement. (Id. at 69:3-8.)

Attorney Gregg Bernhard of Greenberg Traurig also testified that the Project was designed to be exempt from registration under ILSA based on the improved lot exemption. (Dkt. No. 98-5, Benjamin Decl., Ex. 11, Bernard Depo. at 37:8-19.) A decision not to register with HUD was made because the project was exempt under the two year exemption. (Id. at 43:5-16.) Bernhard also discussed the damages provisions under ILSA and stated that ILSA does not require specific performance to be included as an express provision. (Dkt. No. 81-28, Bernhard Depo. at 117:14-21.) However,

he explained that you cannot take it away and he expressed his concern that by stating in the contract that buyers may get their money back, it could lead to confusion with respect to a buyer. (Id.) Mr. Coss, Tarsadia's counsel, said "he thought this was within the rules of the exemption and that he was willing to take that risk."[10] (Id. at 117:23-24.)

Plaintiffs counter that Defendants not only failed to disclose the two year rescission right but also falsely asserted that Plaintiffs were in danger of losing their deposits if they failed to close escrow on their units at the Hard Rock. Specifically, Plaintiffs contend that in August 2007, Defendants falsely stated in a Notice that "[w]e hate to say it but if you don't close on the date to be announced by the developer, you will be in default and lose your deposit . . . ." (Dkt. No. 81-41, Meade Decl., Ex. 31.) Plaintiffs assert that Greenberg Traurig had substantial expertise with condominium hotel developments and ILSA and knew that the two year exemption under ILSA would apply only if the promise to deliver completed units within two years was not illusory. However, they drafted a contract where Defendants were given a right to terminate the Purchase Contract at any time until closing if the Seller failed to sell more than 75% of the Units even though HUD Regulations require that a presale clause must expire within 180 days after the first contract has been signed.

In support of their argument, Plaintiffs direct the Court to a June 20, 2007 letter from a purchaser, David McCain, to Ed Coss seeking to rescind the contract based on violations of ILSA. (Dkt. No. 81-54, Meade Decl., Ex. 44.) In response, on June 25, 2007, Brent McLean, a Tarsadia and Playground employee, downloaded a Florida Bar Journal article entitled "The Interstate Land Sales Full Disclosure Act's two-year completion exemption." (Dkt. No. 81-44, Meade Decl., Ex. 34.) According to Plaintiffs, the article explained "why the purchase contract in this case negated the two-

---

[10]Plaintiffs raise this comment by Coss as indicative that Defendants were reckless in disregarding the probability that ILSA applied to the Project. The issue raised before Coss concerned the damages provision which the Court held was not illusory. Therefore, his comments are not supportive of Plaintiffs' argument.

year completion exemption." (Id.)  Shortly thereafter, in late June 2007, McLean drafted two internal memoranda discussing the McCain issue and concluded that the purchase contract was exempt under ILSA, and therefore, ILSA was not violated. (Dkt. No. 81-58, Meade Decl, Ex. 48; Dkt. No. 81-59, Meade Decl., Ex. 49.)  Subsequently, on July 6, 2007, General Counsel Coss wrote a letter to McCain's attorney concerning the alleged ILSA violations indicating that she failed to state the basis of the alleged violation and that ILSA would not apply to McCain's contract.  (Dkt. No. 81-55, Meade Decl., Ex. 45 at 2-3.)

Plaintiffs argue that these facts demonstrate that McLean along with Tarsadia Hotel's General Counsel Coss and Playground Attorney Mike Smith[11] researched ILSA and its exemptions.  Plaintiffs allege that Defendants knew that the contractual promise to build within two years could not be illusory. (Dkt. No. 81-32, Meade Decl., Ex. 22, Davis Depo.)

Plaintiffs' facts, in opposition, demonstrate that both Tarsadia Defendants and Greenberg Traurig[12] knew the disclosure requirements of ILSA and the improved lot exemption.[13]  However, they do not show that Defendants knew the representations or affirmative representations were false when made.  Further, the facts do not show Defendants' intent to deceive Plaintiffs.  Therefore, the facts do not create a genuine issue of fact that Defendants knew or recklessly disregarded the probability that ILSA applied to the Hard Rock Units and whether they intended that the purchasers would rely on those false statements and omissions.  Specifically, the facts do not show that

---

[11]Mike Smith was consulted with during the McCain issue. (Dkt. No. 81-59, Meade Decl., Ex. 49 at 3.)

[12]It is undisputed that Greenberg Traurig has substantial expertise with condominium-hotel developments which included prior experience registering projects with HUD; prior experience preparing purchase contracts that comply with ILSA; and knowledge of the procedures for filing a Final Subdivision Public Report with HUD. (Dkt. No. 112-1 at 122.)

[13]Plaintiffs do not address or point to facts in the record to demonstrate whether Developer Defendants knew about the 180 day requirement and whether it was intentionally omitted.

1  Tarsadia Defendants' failure to include the 180 day limit on the presale contingency
2  requirement was done intentionally to deceive Plaintiffs.   McCain's conclusory
3  allegation of ILSA violation does not specifically state the basis of his allegation to
4  have put Defendants on notice.

5       Accordingly, the Court GRANTS Tarsadia Defendants' motion for summary
6  judgment on the ILSA anti-fraud cause of action.   Because Plaintiffs have
7  demonstrated there are no genuine issues of material fact as to the fraud provisions
8  under ILSA based on California law, the Court also GRANTS Tarsadia Defendants'
9  motion for summary judgment on the common law fraud cause of action.

10 **E.**   **Negligence**

11      **1.**   **Statute of Limitations**

12      Tarsadia Defendants and Playground move for summary judgment on the
13 negligence claim alleging it is barred by the three year statute of limitations for
14 negligent misrepresentation.   Plaintiffs contend that they were not on inquiry notice
15 until some point after the spring of 2008;[14] therefore, their negligence cause of action
16 is timely.

17      The statute of limitation for negligence is three years from discovery. Cal. Civ.
18 Proc. Code § 338(d).  Generally speaking, a cause of action accrues at "the time when
19 the cause of action is complete with all of its elements." Norgart v. Upjohn Co., 21
20 Cal.4th 383, 397 (1999).  The discovery rule "postpones accrual of a cause of action
21 until the plaintiff discovers, or has reason to discover, the cause of action." Fox v.
22 Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005).  Unlike federal law, under
23 California law "[a] plaintiff has reason to discover a cause of action when he or she
24 'has reason at least to suspect a factual basis for its elements.'" Id. (internal quotation
25 marks and citation omitted); see O'Connor v. Boeing N. Am., Inc., 311 F.3d 1139,
26 1147 (9th Cir. 2001) (California standard "fundamentally distinct" from federal

27 _____

28      [14]The original complaint was filed on May 18, 2011 in San Diego Superior
Court.

[11cv1842 GPC(KSC)]

standard).  As to the term "elements," the court looks at whether the plaintiffs had reason to at least suspect that a type of wrongdoing has injured them, not whether the plaintiffs suspects "facts supporting each specific legal element of a particular cause of action." Fox, 35 Cal. 4th at 807.  Furthermore, "[t]he discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." Fox, 35 Cal. 4th at 807; cf. Merck & Co. v. Reynolds, 559 U.S. 633, 652 (2010) (federal standard).  "It is irrelevant that the plaintiff is ignorant of . . . the legal theories underlying his cause of action," or that "an attorney has not yet advised him." Norgart v. Upjohn Co., 21 Cal. 4th 383, 398 n.2 (1994) (citing Gutierrez v. Mofid, 39 Cal. 3d 892, 897-98 (1985)).

In a prior order on Defendants' motion to dismiss the second amended complaint as to statute of limitations on the negligence cause of action, Judge Sabraw noted that the relevant inquiry is when did Plaintiffs have a suspicion that they had been harmed by wrongdoing. (Dkt. No. 34 at 15.) According to Plaintiffs' allegations, this occurred when they discovered some time after the close of escrow that the rental income splits were not as represented. (Id., Dkt. No. 69 at ¶ )  Since the complaint did not specify the precise time of the discovery, the Court was unable to determine the expiration of the statute of limitations and denied the motion to dismiss. (Id.)

Playground argues that Plaintiffs testified that they were aware of some injury on or before May 18, 2008 because (1) they wanted to get out of the Hard Rock purchase prior to May 18, 2008 but were not allowed; (2) they believed prior to May 18, 2008, that they were misled as to profitability of the purchase; and/or (3) they believed prior to May 18, 2008 that the contractual documents were contrary to the promises made to them in deciding to enter into the purchases. (Dkt. No. 98-1 at 29.) Tarsadia Defendants argue that the negligence claim is barred by the three year statute of limitations and accrued at the time the buyers signed the contracts in 2006.

In response, Plaintiffs argue that they exercised reasonable diligence and assert that it was reasonable for a buyer to have wanted to get out of the transactions prior to

May 18, 2008 because the real estate market was in a steep decline in the fall of 2007and loan financing was difficult.  Moreover, as to the concerns initially raised by Plaintiffs about the revenue they received from their units, they were advised that the "ramp up" period[15] would continue through the spring of 2008 and so inquiry notice could not have been triggered until then.

Plaintiffs began receiving their rental income statements in late 2007/early 2008 shortly after closing.  Plaintiff Agachi testified that he was losing a lot of money and was always in the negative and the prices kept going down and association fees were getting larger. (Dkt. No. 94-8, Ds' Appx of Exs., Ex. 1, Agachi Depo. at 23:11-24:9; 42:25-46:19.)  Agachi stated he contacted someone at the hotel soon after he received the first income statement to see if he could get his money back.  (Id. at 43:22-44:6.) He said that he did not call Defendants after the first statement to give them the benefit of the doubt because it was brand new and decided to wait and see but he did not like it.  (Id. at 44:14- 22.)  Then he called seven or eight months later because the hotel told him that it would take time.  (Id. at 45:21-46:2.)  According to Agachi, Defendant misrepresented the income, the occupancy, and charges. (Id. at 115:1-20.) He testified that there was a contradiction between written statements and oral statements about the amount of revenue during the time prior to closing.  (Id. at 185:19-188:20.)  When questioned about the discrepancy, he was told that since it was new, he would have to wait for the hotel to get more occupancy.  (Id. at 188:2-7.)  In the first couple of statements, in December 2007 and January 2008, Abachi noted a change in the split from the 50/50 that he had understood to deduction of additional costs. (Id. at 255:17-256:19; 257:20-25.)

Plaintiff Adelman also confirmed that certain fees that were charged was not what he understood them to be.  (Dkt. No. 94-8, Ds' App'x of Ex. No. 2, Adelman

---

[15]The buyers were told in October 2007 that there would be a ramp up period during which rental revenues would be lower than promised and that the developer expected occupancy rates would start to rise in the spring of 2008.  (Dkt. No. 103-5, Shrag Decl., Ex. C at 3.)

[11cv1842 GPC(KSC)]

Depo. at 152:6-14.) The rental income splits varied from the representations made to him before he signed the contract. (Id. at 237:9-239:14.) He also did not think he had to pay for the upkeep of the unit, and marketing fees. (Id. at 237:9-238:3.) The marketing fee was shown on his statements beginning February 2008.[16] (Id. at 269:6-15.) When he contacted the hotel and asked about the charges, he was told it was part of the agreement. (Id. at 238:13-16.)

Plaintiff D. Beaver stated that when he first received the first owner statement, he was shocked with the change from the 50/50 split that he understood to a 80/20 split where he was getting 20 percent of the entire revenue and indicated he was not happy. (Dkt. No. 94-10, Ds' Appx . of Exs. No. 11, D. Beaver Depo. at 29:8-13; 30:20-31:9; 44:1-13.) He contacted someone from the Hotel once he started receiving his owner statements. (Id. at 62:12-20.) He called Hard Rock to raise the issue of revenue within a month of the receiving the November 2007 statement but did not receive a resolution and had to accept what he received. (Id. at 62:12-63:21.) He stated that the numbers seemed way off than his expectations. (Id. at 181:18-182:9.) In another portion of his deposition that Plaintiffs cite, D. Beaver stated that the owner statement was an accurate calculation of the split that he understood he would be receiving prior to closing escrow. (Dkt. No. 103:9, Shrag Decl., Ex. G, Beaver Depo. at 48:4-18.)

L. Beaver testified that her husband expressed concern about the rental income being lower than what he expected. (Dkt. No. 94-10, Ds' Appx. of Exs. No. 10, L. Beaver Depo. at 41:16-19.)

Plaintiff K. McKenna testified that he was severely disappointed in the first statement  but not surprised since it was new and it was December, the worst month to open a hotel; however, he started to question the amount of the checks around March/April 2008 because there was no increase in the amount of the checks. (Dkt. No. 94-12, Ds' App'x of Exs. No. 21, K. McKenna Depo. at 87:21-89:11.) He also

---

[16]Counsel noted that as to Adelman, income statements were only recovered starting in February 2008.  (Id. at 269:6-15.)

[11cv1842 GPC(KSC)]

indicated that from the beginning that Defendants were not following through with their promises. (Id. at 98:5-12.) He testified that while the actual overall profit was not what he had anticipated, the calculation of the split was what he had thought it would be. (Dkt. No. 103-11, Shrag Decl., Ex. I, K. Kenna Depo. at 198-17-199:14.)

Plaintiff Gauba testified that when she got her first statement, and saw the occupancy rate was much lower than they had indicated, she contacted the hotel and was told that the launch was not that strong. (Dkt. No. 94-13, Ds' App'x of Exs. No. 28, Gauba Depo. at 68:14-69:10.) On December 31, 2007, pursuant to a request she made from a woman named Fran Bates, she got an email with a revenue statement attached and she stated that the revenues for the first month "sucked" and she talked to somebody afterwards about it. (Id. at 140:10-141:8.) She was informed it was a "break-in period" or "burn-in period." (Id. at 68:14-18; 141:12-16.) She also was not happy about the splitting of revenue and the group sales fee. (Id. at 142:14-142:9; 145:3-24.) Gauba stated that the split was what she expected but the only surprise was an additional group sales fee. (Dkt. No. 103-13, Shrag Decl., Ex. K, Gauba Depo. at 118:22-119:4.) When she talked to a representative of Defendants, the person said there was nothing that could be done about it. (Id. at 120:9-121:11.) Gauba did not like it and wanted to get out of it at that time. (Id.)

Here, all Plaintiffs testified that they were not happy with the revenue income shortly after they closed. In response, Defendants explained that the "ramp up" period would yield lower revenues until the Spring 2008. The issue concerning the revenue and the "ramp up" explanation by Defendants delayed accrual based on the discovery rule to sometime in the spring 2008. However, besides the lackluster revenue in the first few months, Plaintiffs noted other additional charges and splits that they were not aware of prior to closing that put them on notice of a wrongdoing. Agachi noted that there was a change in the 50/50 split in the first couple of months. Adelman also noted that the rental income splits were different than the representations made to him before he signed the contract and certain fees were charged that differed from what he

understood in February 2008.  While Beaver stated he was shocked at the first owner statement when the split was 80/20 instead of the 50/50 that he thought he would receive, he later stated that the owner statement was an accurate calculation of the split that he understood he would be receiving.  McKenna testified that in March/April 2008, he started to question the amounts of the revenue since there was no increase by then.  Gauba, in December 2007/January 2008, was not happy with the revenue but also not happy with the additional group sales fee.

Besides the revenue issue that all Plaintiffs were not happy with, Plaintiffs were aware of some "wrongdoing" as to additional charges and improper income splits in the first few months after closing.[17]  The above facts establish that prior to May of 2008, Plaintiffs had learned that the promised revenue split was not what had been represented.   As of this time, Plaintiffs had reason to suspect misrepresentations and a breach of contract.  The question remains whether these facts alerted Plaintiffs to the elements for their negligence cause of action.  Plaintiffs allege that Defendants had a legal duty to disclose the two-year right to rescind and to replace the language in the contract concerning a three-day right to rescind with this two-year right. (Dkt. No. 69, TAC at 38).

Given the nature of the Plaintiffs' negligence claim, the Court concludes that there is a genuine issue of fact as to whether Plaintiffs were on inquiry notice by May 18, 2011 of the facts supporting their claim for negligence.  Accordingly, the Court DENIES Tarsadia Defendants and Playground's motions for summary judgment on the negligence cause of action based on the statute of limitations.

**2.    Merits**

Playground argues that it had no duty as a real estate broker to determine if ILSA was violated and to disclose the two year rescission to Plaintiffs.  Tarsadia Defendants do not address the merits of the negligence claim.  Plaintiffs contend that Playground

_____

[17]As to Plaintiff McKenna, he testified that he began to question the amount of the revenue in March/April 2008 since there were no increases which put him on inquiry notice on the revenue issue.

was aware of the ILSA issue when a purchaser's attorney alleged, in June 2007, that the purchase contract violated ILSA. At that time, Playground, along with Tarsadia, were involved in the drafts of a memorandum in connection with the letter. Plaintiffs assert that Playground was aware that the purchase contract potentially violated ILSA and the buyer's right to rescind under ILSA might not have been properly disclosed.

In a negligence cause of action, Plaintiff must show duty, breach of duty, causation, and damages. Friedman v. Merck & Co., Inc., 107 Cal. App. 4th 454, 463 (2003). The existence of a duty is the threshold element of negligence. Id. "The existence of a duty is a question of law for the court." Holmes v. Summer, 188 Cal. App. 4th 1510, 1518 (2010) "It is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer." Id. at 1518-19 (citing Lingsch v. Savage, 213 Cal. App. 2d 729, 735 (1963)). This also applies to the seller's real estate agent or broker who is also aware of such facts. Id. at 1519. A real estate agent or broker may be liable "for mere nondisclosure since his [or her] conduct in the transaction amounts to a representation of the nonexistence of the facts which he has failed to disclose." Id.

California court have held that real estate agents or brokers have a duty to not only disclose a physical property defect but also to disclose issues that otherwise affect the desirability of the purchase. See Alexander v. McKnight, 7 Cal. App. 4th 973 (1992) (duty to disclose neighborhood nuisance); Reed v. King, 145 Cal. App. 3d 261 (1983) (duty to disclose murders on the property); Lingsch v. Savage, 213 Cal. App. 2d 729, 737 (1963) (duty to disclose that improvements were constructed in violation of building codes or zoning regulations). Real estate agents and brokers have also been held to have a duty to disclose conditions regarding close of escrow. Wilson v. Lewis, 106 Cal. App. 3d 802, 807–809 (1980) (duty to disclose conditions regarding inspection and date of deposit).

[11cv1842 GPC(KSC)]

Plaintiffs allege that Defendants had a legal duty to disclose the two year right to rescind in the Public Report; had a duty to replace the language in the contract concerning a three day right to rescind with language disclosing the two year right; and a duty to otherwise disclose the two year right to rescind and is premised on 15 U.S.C. §1703(d).  (Dkt. No. 69, TAC ¶ 139.)  The acts underlying the negligence claim occurred in May 2006 and December 2006 when the Plaintiffs entered into a contract with Defendants.

This cause of action is dependent on the underlying liability pursuant to ILSA, 15 U.S.C. § 1703(d), upon which Plaintiffs has not alleged a cause of action, and upon which it would appear they cannot recover because the statute of limitations have run on this provision.  The Court questions whether a negligence cause of action can survive if it is based on an underlying federal cause of action that could be time barred. Cf. Winn v. U.S., 593 F.2d 855 (9th Cir. 1979) (FTCA does not create a cause of action for wrongful death independent of state law and since underlying state claim was time barred, there was no existing cause of action to which federal statue of limitations might attach); Barringer v. Clackamas County, No. CV 09-068-AC, 2010 WL 5349206, at *9 (D. Or. Nov. 22, 2010) (in order for negligence claim to survive when plaintiff alleges both a section 1983 claim and a negligence claim and the 1983 claim is dismissed, the claim may survive only if it is premised upon facts distinct from those underlying the section 1983 claim).  No party has addressed the existence of a duty and breach of that duty based on the underlying ILSA disclosure provision under 15 U.S.C. § 1703(d).  Accordingly, the Court DENIES all Defendants' motion for summary judgment as to the negligence cause of action.  As such, the Court DIRECTS the parties to provide supplemental briefing addressing these issues.

**F.     UCL Claim as to all Defendants**

Tarsadia Defendants move for summary judgment and argue that since ILSA does not apply, the UCL "unlawful" prong fails, and further argue that the claims are not timely.   Defendant Playground also moves for summary judgment on the UCL

claim arguing they are barred by the statute of limitations and joins in Tarsadia Defendants' statute of limitations argument.[18]   Plaintiffs also move for summary judgment solely based on Defendants' violations of the unlawful prong of the UCL through ILSA violations under § 1703(a)(1).[19]

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).   The UCL imposes a four year statute of limitations. Cal. Prof. & Bus. Code § 17208. The Ninth Circuit has held that section 17200 may not be used to avoid the statute of limitations of the underlying laws allegedly violated. See Silvas v. E*Trade Mortg. Corp., 514 F.3d 1001, 1007 n. 3 (9th Cir. 2008) (holding that plaintiffs may not extend the TILA statute of limitations by pleading a UCL claim based on a time-barred TILA claim).   In Silvas, the court's discussion about the UCL statute of limitations was  in conjunction with its holding that the Home Owners' Loan Act of 1933 ("HOLA") preempted the UCL claims.  Id. However, district courts have held that Silvas also stands for the proposition that a federal statute of limitations period should apply when a state law cause of action is based on it. O'Donovan v. Cashcall, Inc., No. C 08-3174 MEJ, 2012 WL 2568174, at *3 (N.D. Cal. July 2, 2012) (citing Newsom v. Countrywide Home Loans, Inc., 714 F. Supp. 2d 1000, 1014 (N.D. Cal. 2010) ("In addition, Plaintiffs impermissibly are attempting to revive an otherwise time-barred TILA claim under the guise of a fraud claim.")); Santos v. Countrywide Home Loan, 2009 WL 2500710, at *7 (E.D. Cal. Aug. 14, 2009) (discussing Silvas proposition that UCL cannot be used to remedy violations of a time barred TILA claim); Rodrguez v. U.S. Bank Nat'l Ass'n, No. 12-

---

[18]Playground also moves for summary judgment on the merits of the UCL claims. However, since the Court concludes that the UCL claims are barred by the statue of limitations, it need not address the merits of the UCL claims.

[19]Plaintiffs do not move for summary judgment on the fraudulent, deceptive and unfair prongs of the UCL.  (See Dkt. No. 81 at 22 n. 9.)

[11cv1842 GPC(KSC)]

989 WHA, 2012 WL 1996929, at *2 (N.D. Cal. June 4, 2012) (underlying law of TILA and one year statute of limitations).  The court in O'Donovan explained that while cases discussing Silvas addressed federal preemption, these courts also separately concluded that a "federal statute's limitations period should apply when a state law cause of action is based on it." O'Donovan, 2012 WL 2568174, at 3 (citing Newsom v. Countrywide Home Loans, Inc., 714 F. Supp. 2d 1000, 1014 (N.D. Cal. 2010) and Adams v. SCME Mortg. Bankers Inc., No. CV F 09-501 LJO SMS, 2009 WL 1451715, at *11 (E.D. Cal. May 22, 2009)).

Plaintiffs also argue that the four years statue of limitations applies even if the UCL claim is based on an underlying violation of law that is subject to a shorter statute of limitations and cites to Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 178-79 (2000) (longer UCL statute of limitations, not shorter period, applied based on failure to pay wages).  While Cortez held that "any action on any UCL cause of action is subject to the four-year period of limitations," courts have held that this only applies to violations of state law, not federal law.  See O'Donovan, 2012 WL 2568174, at *4 (explaining that Cortez only applies when the UCL claims is based on violations of the state law, not federal law); Kohl v. American Home Shield Corp., No. 11cv700 JM(NLS), 2011 WL 3739506, at *4 (S.D. Cal. Aug. 24, 2011) (RESPA's one year statute of limitations applied and distinguishing Cortez as based on application of state law by the California Supreme Court as opposed to relief sought which depended entirely on application of RESPA, not state law).  The court in O'Donovan also cites to the California Practice Guide on UCL Claims,  "[n]otwithstanding Cortez and the rule that the longer (four-year) limitations period of Section 17208 applies when borrowing a violation of a statute carrying a shorter limitations period, the result may be different when the claim at issue is federal and the federal law supplies a shorter limitations period." Stern, Cal. Prac. Guide: Bus. & Prof. Code § 17200 Practice, ¶ 5:292.1 (The Rutter Group 2012)." O'Donovan, 2012 WL at 2568174, at *4.

In this case, Plaintiffs' "unlawful" claim against Tarsadia Defendants under the

UCL is based on violations of a federal statute, ILSA, and specifically 15 U.S.C. § 1703(a)(1)(A) & (B) and § 1703(d).   (Dkt. No. 69, TAC ¶ 137; Dkt. No. 103 at 26.) These provisions have a three year statute of limitations from the date of signing of the contract.   See 15 U.S.C. § 1711(a), (b).

Here, Plaintiffs signed their contracts at one of the two selection events, May 18, 2006 and December 12, 2006.[20]   (Dkt. No. 104-1, Ds' Opp. to Ps' Separate Statement No. 4.)   Therefore, the three year statute of limitations ran the latest on December 12, 2009.   Therefore, Plaintiffs' UCL allegations against Tarsadia Defendants are barred by the statute of limitations.

As to Playground, Plaintiffs allege Playground committed unfair and deceptive business practices in violation of the UCL when it failed to disclose all facts materially affecting the desirability or value of the property that are not known to or within the diligent attention and observation of the parties.   (Dkt. No. 69, TAC ¶ 140.) Specifically, they allege that Plaintiffs were not informed about their two year right to rescind.   (Id.)

The allegations against Playground, although couched in terms of state law, is dependent on the resolution of federal and not state law.   See Kohl, 2011 WL 3739506, at *4.   Plaintiffs allege that Playground failed to disclose the two year right to rescind to the Plaintiffs.   The basis of Plaintiffs' unfair competition cause of action is dependent on federal law.[21]   Accordingly, the Court also concludes that the three year statute of limitations under ILSA also applies from the date of signing of the contract and the UCL claims against Playground are barred.

Accordingly, the Court GRANTS Tarsadia Defendants and Playground Defendant's motion for summary judgment on the UCL claims as barred by the statute

_____

[20]One purchase contract was signed in 2007.  (Dkt. No. 104-1, Ds' Opp. To Ps' Separate Statement No. 4.)  However, based on the three year statute of limitations, this contract would also be barred.

[21]The Court also notes that Judge Sabraw already ruled that Plaintiffs cannot state an ILSA claim against Playground.  (Dkt. No. 34.)

[11cv1842 GPC(KSC)]

of limitations.  Moreover, the Court DENIES Plaintiffs' motion for summary judgment as to the "unlawful" prong of the UCL based on Tarsadia Defendants' conduct.

**Conclusion**

Based on the above, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Tarsadia Defendants and Defendant Playground Destinations' motions for summary judgment as to all causes of action except the Court DENIES Tarsadia Defendants and Defendant Playground's motions for summary judgment as to the negligence cause of action.  The parties shall file supplemental briefs as described above as to the negligence cause of action on or before **November 5, 2013.**

IT IS SO ORDERED.

DATED:  October 16, 2013

HON. GONZALO P. CURIEL
United States District Judge

[11cv1842 GPC(KSC)]